## COURTRIGHT *v.* BURNES.

*(Circuit Court, W. D. Missouri, W. D.   May, 1881.)*

**1. COMPROMISE—ACTION TO SET ASIDE.**

C. took a contract in his own name to build a railroad; the remuneration being certain bonds of the railroad company, thereafter to be issued, and also all funds or property which could be obtained as a bonus from people living along the proposed route. B. and several others, however, had certain interests in the profits of the contract, and C. constituted B. his attorney in fact to manage the construction, and all other matters connected with the enterprise. After the road had been built, C. pressed B. for an accounting and settlement, which B. delayed, assigning various reasons. Finally, C. constituted an attorney his attorney in fact and agent, with full powers to obtain a complete settlement. The attorney thereupon called upon B., presented his power of attorney, and the two then made a writing, reciting the transactions in which B. had been engaged, and agreeing to meet at a certain date for a settlement of all these matters. They accordingly did meet; B. accompanied by his attorney, and another person interested in the contract. Some papers in the nature of accounts were presented, but these covered less than half the transactions in dispute. Propositions and counter-propositions were made for full settlement, and after two days of negotiation a full settlement was effected, the papers executed, and a release in full of all claims growing out of the transactions given to B. *Held,* that this was not a mere accounting of an agent to his principal, in which any mistake or fraud in the accounts rendered would be a ground for opening the settlement, but was a compromise, in which each yielded something of what he considered his rights, and hence chancery would not set it aside.

**2. SAME—TENDERING BACK DEEDS.**

B. having made a deed to C. of all his interest in the lands acquired along the route, as part of the settlement, C. could not maintain a bill to set aside the settlement without tendering a reconveyance of this property.

In Equity.   Bill to set aside settlement, and for an accounting.
*De Camp, Botsford & Williams,* for complainant.
*Waters, Stringfellow, Woodson & Hull,* for respondent.

MILLER, Justice, (*orally.*)   We have arrived at a satisfactory conclusion to us in the case of *Milton Courtright* v. *James N. Burnes,* and I will proceed to announce the judgment of the court, and give our reasons for it.

The history of the transactions which are brought before us by this bill in chancery begins with the proposition of constructing a railroad from some point on the Chicago & Rock Island Railroad, in a southwestern direction, through the states of Iowa and Missouri. It is not very clear who was most prominent in getting up the plans. It appears, however, that the defendant, Burnes, was one of the parties engaged in it, and that Mr. Winston, who became president of the corporation organized, was another, and one or two citizens of the state of Missouri besides, and that the main reliance for building the road, at least from Washington, in Iowa, to Cameron, in Missouri, was upon the aid which should be given by the Chicago, Rock Island & Pacific Railroad Company.

The contract for the construction of the road from Washington to Cameron was made by Mr. Courtright, the present plaintiff, and in his name, with the corporation known as the "Southwestern Railroad Company." Courtright undertook to build the road between those two points, and he was to receive for the building of the road $5,000,000 of the bonds of the Southwestern Railroad Company, which would have been of little value but that their payment was guarantied by the Rock Island Railroad Company. He was also to receive all such other donations, gifts, subscriptions, and aid of every kind, as could be obtained along the line of the road from parties interested in having it built. There is no question in our minds—there can be none—but that before or after, but probably before, this contract was made, he had an agreement with Burnes and Winston and Aller, three gentlemen residing in this region of the country, that they should have an interest in the profits of the contract. We do not think it is established that they were interested in the contract itself. It does not appear that they would be liable for any loss, or that they were under any obligations to the corporation which was to own the road; but it is very clear—and for the purpose of this suit it is immaterial when that arrangement was made—it is very clear that Mr. Courtright agreed with Winston, Aller, and Burnes that they should have half of the profits that arose out of that contract, and they should superintend the whole of the construction of the road; that he did not intend to be here to do it, and that he left that to them. In pursuance of that arrangement, and contemporaneously with it, and probably because of it, Winston was made president of the corporation. In order, also, that Winston might properly represent Mr. Courtright, he had a power of attorney from Courtright. The main part of the road was probably built in that way, and under that state of affairs; that is, the road from Washington to Cameron.

About the same time, and contemporaneously with this, there were several projects for the extension of that road, or connection with it, to points on the Missouri river. It is only necessary for the purposes of this suit to speak of the one to Atchison. Contracts were made to build this road to Atchison. The contract for building the road to Atchison was not given to Mr. Courtright. It is not material to state in whose name it was taken, because it was assigned to a man by the name of

Glover, I believe, to hold in trust. It is equally certain that in that contract Mr. Courtright had an interest of two-fifths, not, as in the other case, in its profits, but was interested in the contract, which was held by the trustee for the benefit of the parties.

These works went on simultaneously. About the time the railroad was completed between Washington and Cameron, for some reason or other, Mr. Winston ceased to be president of that company, and ceased also to be representative of Mr. Courtright in the contract. There seems to have been a disagreement between him and Aller and Burnes and Campbell, who, about this time, in some way, had become interested in the one-half that did not belong to Courtright. At any rate, Mr. Winston retired from his place as trustee and representative of this one-half interest that was not owned by Mr. Courtright, and also relinquished the power of attorney and right to act for Mr. Courtright; and at that time he delivered to Mr. Burnes an order stating that he (Burnes) was authorized to assume all the control which Winston had previously had over the matters relating to that contract. And about the same time Mr. Courtright made a power of attorney to Mr. Burnes, giving to him the powers which had formerly been exercised by Mr. Winston. The exact nature and extent of the power of attorney from Courtright to Burnes, it is not necessary, as we think, in this case, to determine. It is admitted by the counsel in this case that at the settlement, which is the main subject of controversy here, all matters which were in controversy were intended to be settled and adjusted. And whether Burnes acted under a power of attorney that was competent or not, or whether De Camp acted under a power of attorney which authorized him to do all these things, is not material, because it has been admitted in argument—and, if not, it is established by telegrams and letters—that De Camp had full power, and that Burnes was settling up all that was between him and Courtright unsettled, growing out of either or both of these two contracts.

Having stated these preliminary circumstances, we proceed now to consider the present suit or bill in chancery itself. It was brought by Mr. Courtright on the proposition or idea that Mr. Burnes, as his agent or attorney, had not accounted properly to him for money and property received as such agent and attorney in fact; that there was in his hands, a large sum of money and bonds, and perhaps other property, for which he had not accounted, and for which this bill requires him to account before the court. The bill, after stating that much in general terms, proceeds to say that there had been an attempt at a settlement between Courtright and Burnes, made in August, 1877, and that in this settlement Courtright was represented by his agent and attorney in fact, Mr. De Camp; that the settlement itself was fraudulent and unjust, and in many ways inequitable; and the bill asks that it may be set aside; that a release which Courtright, through De Camp, had given to Burnes, and which on its face purported to be a full satisfaction and adjustment of all claims growing out of these matters, may be set aside on the ground of fraud and misrepresentation practiced by Burnes upon De Camp in

the settlement. If these allegations are sustained, the release ought to be set aside, and the case considered *de novo*. If they are not sustained, the release executed on that settlement is a full defense to all claims set up in this bill. So that the first and principal question to be decided is whether that release is to be treated as fraudulent, and whether it shall be annulled and set aside by order and decree of this court.

The first consideration important in the decision of that proposition is to get at the nature and character of the papers that were executed, and of the settlement that was made. Counsel for the plaintiff in this bill have, throughout the argument of the case, treated the transaction as though Mr. Burnes was nothing more than an ordinary agent employed by Mr. Courtright to look after his interests, and that Mr. Burnes, in that settlement, presented as such agent an account of debtor and creditor, and that the adjustment was made upon the basis of that account, and upon the presumption of Courtright's attorney that the account was correct, and that in coming to that conclusion he relied upon the statements and representations made by Mr. Burnes. If this statement were true about the account, if there was any fraud, or even if there was no intention of fraud, but if there was a misrepresentation, known to the party who made it,—Mr. Burnes; or if there was any serious mutual mistake in such settlement as that a court of equity would set it aside, and place the parties where they were before the settlement was made; or if such settlement were one in which the accounts were kept solely by the agent, and in which they ought to be kept in regular order in books, in which naturally the principal, if he were present, or his agent, would rely solely on the statements and accounts presented by the agent,—any mistake or error growing out of misrepresentation or reliance on the account might be corrected. But we are of opinion that this is not in the nature of a settlement of that kind, and, to see what is its nature and character, it is necessary to look into the evidence of the matters and things which precede and accompany this settlement. We leave out of the question for the present that Mr. Burnes claims that he and Courtright were jointly interested in this affair, and that it was his right to take care of his own interest in making this settlement, and we proceed to some of the circumstances preceding and accompanying the settlement, to show that it was not such a one as that alluded to.

In the first place, Mr. Courtright seems to have been pressing Mr. Burnes, and urging him, for six or eight months, not only to render an account, but the phrase repeatedly used is, "render an account and make settlement and payment." Mr. Burnes, for various reasons, seemed not ready to make a settlement, and put it off, asking for time; Courtright pressing all the time for an adjustment of the matter. At this time in the history of these proceedings, Mr. Burnes was still the attorney in fact of Courtright. The power which he held from Courtright, and had held for five or six years, was unrevoked. But in July, 1877, Mr. De Camp appeared at the business place or residence of Mr. Burnes with a regular power of attorney from Courtright authorizing him to make all the settlements, and with full power to settle all the matters in

dispute between them, which power of attorney revoked Burnes' former power of attorney, and discharged him as agent, and he was then no longer agent. Mr. De Camp appeared at Burnes' place of business with the demand that they proceed to a settlement of the accounts and adjustment of the transactions.

Mr. Burnes then said he was not ready; stated that neither party could then proceed properly to a settlement and adjustment; that he and De Camp, or De Camp alone, should go over the line of the road, and make inquiries respecting the matters which must be considered in that settlement. All this Mr. De Camp declined, and the interview at that time resulted in a written agreement between De Camp, as attorney of Courtright, and Burnes, in which they agreed to meet about the 12th or 15th of August, which was finally postponed till the 22d. They signed the paper—both of them—that they would meet for a settlement; and the paper recites in what transactions Mr. Burnes had been engaged, and states that the whole of it was to be settled and adjusted between them. They did meet, and Mr. De Camp, who was both an attorney at law and agent and attorney in fact for Mr. Courtright, seems to have been satisfied with the knowledge he had of the facts to go through a settlement. Mr. Burnes was accompanied by his counsel, by Mr. Aller, who was interested with him in these different transactions, and by his nephew, who kept the accounts.

Now, if we can imagine anything better calculated to produce an idea that this settlement was to be formal, valid, important, and final, than all these details and all these meetings, I do not know how it is to be done. They took two days and more to make a settlement, and papers were produced in the nature of accounts; but it is perfectly clear in looking at the settlement that was made, and the purpose for which it was made, that they constituted but a very small part. Perhaps I am not exactly right in saying a very small part; but they constituted but a part, and probably not the largest part, of the transactions which were settled and adjusted at that time. In fact, so far from that paper being simply the basis on which the accounting of Mr. Burnes and the settlement was made, the parties had not been together long before propositions began to be made for a general compromise. This appears from the telegrams, which are a part of the evidence, passing between Mr. Courtright and Mr. De Camp, showing that various propositions were made, and that they were not made on the basis of, nor did they rest upon the correctness of, the account. But the parties were saying, "What will you give, and what will you take, by way of a settlement of these conflicting claims?" And the settlement was made, the papers were exchanged, and formally signed. It does not appear that either party was exactly suited with the settlement. Mr. De Camp, as near as I can get at it from these dispatches, very soon after the papers were signed, telegraphs to his principal: "Settled on terms I telegraph. I don't like it." Mr. Courtright says, "Do the best you can, and settle, if it is your judgment." Mr. Burnes, when the settlement commenced, denied that Mr. Courtright had any interest in the Atchison branch, or

was entitled to anything on account of it.    Yet in the settlement finally he recognized that interest, and undoubtedly paid a considerable sum on account of it to Mr. Courtright.

We state these things to show that it is no such thing as merely a recognition of the account, and that the settlement was not made on that basis, but that each and every matter between the parties was settled, or was intended to be settled, and that in the adjustment neither party admitted that the other was right, but that each yielded something for a final compromise.    That this is true is evidenced by a matter that must be considered in two relations, both as to what entered into the settlement to show that it was a compromise, and also to show the impossibility of sustaining this bill on another ground.    It was part of that settlement that Mr. Burnes made a formal deed of release and conveyance of quitclaim to Mr. Courtright of any and all interest which he had in certain lands and lots in Iowa and Missouri, which had been contributed and conveyed to Courtright as part of the funds given to enable him to build the road.    The title to this land was in Courtright, but it is shown that it is part of the profits of the concern, and that Burnes had one-sixth interest in i'.    Burnes conveyed all his interest in these lands and town lots, whatever it was.    Nobody knows what it was worth; at least, it has not been stated in this testimony.    Burnes conveyed and released all that interest to Mr. Courtright, and Courtright, in bringing this suit to set aside that settlement, says nothing about that paper; does not offer to return the paper nor to reconvey the land.    His counsel say that Mr. Burnes had no interest in this land that was capable of being conveyed.    But, if Mr. Burnes had any interest in this land, it was conveyed by this quitclaim deed made at the settlement; and that he had an interest in the land we have not the shadow of a doubt from the testimony, because all the money that was obtained for the building of the road from Washington to Cameron went into its construction.    It was generally admitted that no one received any money from it, and Burnes had received none at the time of this transaction. What profit arose from the building of that part of the road was probably represented by these lands and town lots.    It is certain that Burnes had a one-sixth interest in this property; and what became of it? Whatever his interest was, he conveyed it to Courtright at this settlement.

That Burnes had an interest in these lands appears upon the face of the entire negotiation.    In the letter from Courtright to Burnes, introducing De Camp, in 1876, in which he tells him that Mr. De Camp is authorized "to settle with you for my interest yet in your hands arising from the building of the railroad from Washington to Cameron, and the Atchison branch road,"—in this he says: " I am satisfied our lands are valuable, and should receive our care and attention."  In his letter in regard to a settlement, the only thing which is pointed out besides the Atchison bonds and their interests is "our lands."  Mr. De Camp, in his second telegram to Courtright about the offers made by Burnes at the settlement, says: "Offers all lands and lots, $20,000 in township

bonds, $4,500 cash, to release him alone." To that Mr. Courtright answered: "Suppose you come on with proposition, so that we can talk it over, that I can understand the whole matter. Bring statement of assets in Burnes' hands,—collected and outstanding,—including lands, lots, and houses." Whenever Mr. Courtright speaks of what is in controversy, he alludes to these lands. That is the one thing which he purposely points out and specifies as a matter which he wants attended to. And in the Exhibit F, prepared by Mr. De Camp as the paper to be signed in the settlement, one of the things set out is that James N. Burnes releases all title, right, and interest in the judgments, notes, and all real estate in Iowa to Courtright. So Mr. De Camp himself is aware of this interest, and sets it out in the statement he wants signed at the settlement; and in Mr. Merryman's statement it is said that the said James N. Burnes releases all right, title, claim and interest in all the judgments and notes and evidences of indebtedness in the property aforesaid, and all interest he has in the real estate in Iowa. So it is idle to say that Burnes had no interest in this land, or that Courtright placed no value upon his interest. We cannot see how we can get rid of the argument that, since Mr. Courtright desires this settlement to be set aside, the parties must be placed in the situation in which they were before the settlement was made, and the interest in these lands be reconveyed by Courtright to Burnes.

But we do not propose to rest our decision upon that point, by any means. We refer to it as showing the purpose and character of the settlement between Burnes and De Camp. We think that this was a settlement in the nature of a compromise and adjustment of doubtful and conflicting rights, in which each party desired to settle, and in which each party made concessions, and that they finally came together upon an agreement, each believing at the time he was losing by the transaction, and so settled for the sake of compromise. We say, in such a settlement as that, it must be satisfactorily proved that there was some positive fraud, some false representations made, some gross advantage taken by one party or the other, to set it aside; and, without going fully into the evidence, it is sufficient to say that neither of us believe that any such case has been made against Mr. Burnes, nor do we believe that he intended to commit any fraud upon Mr. De Camp in this settlement. We do not believe that any fraud was committed upon De Camp as the representative of Courtright. It may be that, in rendering his statement in regard to the salary item, it may not have been exactly correct, and we are prepared to admit that there is some doubt about this $18,000 salary item; and if this account was all there was in this case, it might be necessary to refer it to a master for investigation. We are not clear that Mr. Burnes was entitled to that. As to the testimony in regard to the East Leavenworth Company's account of $27,000, or whatever it may be, we think the preponderance of the testimony is in favor of the fact that it was rightfully retained by Mr. Burnes; but whether it is absolutely so or not, it is not necessary to decide in this case. Mr. Burnes made large concessions. Mr. De Camp

was communicating to his principal by telegraph. They were two days in making propositions and counter-propositions. Each said to the other: "You yield, and I will yield. We think it is best, in view of other matters, to have all matters between us settled." And they were settled. And it is not for one party to come in and ask that it be set aside, unless he can clearly show that he was misled and defrauded. This, in our opinion, has not been done in this case.

With these views, gentlemen, in which my Brother KREKEL concurs, the bill in this case will be dismissed.