## THE SAPPHO.

(District Court, D. South Carolina. August 30, 1898.)

1. CONTRACT—SUBSTITUTION OF PAROL FOR WRITTEN AGREEMENT—AGREEMENT OF MINDS.

In order to supersede a written contract by a subsequent parol agreement between the parties, there must have been the same agreement of minds to the abandonment of the old contract as was required to make it; both parties must have understood the matter alike, and assented to the terms of the new agreement.

2. MARITIME LIENS—REPAIRS—POWERS OF MASTER IN HOME PORT.

The master of a vessel which is out of commission, and is being repaired in the home port under a written contract with the owner, though given a general supervision over the work, has no power to bind the vessel for work done outside the contract.

3. SAME—EXTRA WORK—ESTOPPEL OF OWNER.

The owner of a vessel being repaired under a written contract is not estopped by acquiescence from contesting liability for work done outside the contract, where he did not know of it until completed, and the bill for the same was presented for payment.

4. SAME—FREEDOM OF CONTRACT—GOVERNMENT INSPECTION.

Rev. St. §§ 4445–4454, do not give a United States inspector of hulls authority to interfere with the freedom of contract for repairing vessels; and where a written contract for repairs provided that no extra work should be done, unless agreed to by the owner in writing, the vessel cannot be held for extra work done without the owner's knowledge, though necessary to render the vessel safe and sound, and done on the requirement of the inspector, under whose supervision the repairs were made.

5. ADMIRALTY COURTS—POWERS—ENFORCEMENT OF CONTRACTS.

Though courts of admiralty exercise equitable powers, and determine cases on equitable principles, they have no power to set aside contracts voluntarily entered into, because of hardships resulting from their enforcement.

6. MARITIME LIENS—STATE STATUTES—ENFORCEMENT BY COURTS OF ADMIRALTY.

In enforcing liens given by state laws for repairs and supplies furnished vessels in their home ports, courts of admiralty are governed by the principles and restrained by the limitations which ordinarily attach to liens in admiralty in a foreign port under the general maritime law, which rest upon the presumption that credit was given the vessel; and, where it clearly appears that materials furnished a contractor were furnished either on the credit of the contractor or owner, no lien will be enforced therefor.

7. SAME—MATERIALS FURNISHED ON CREDIT OF CONTRACTOR.

One furnishing materials to a contractor for the repair of a vessel, with knowledge that by the terms of the contract there was to be no lien on the vessel for such repairs, is not entitled to a lien.

8. SAME—EVIDENCE—ENTRIES IN BOOKS OF LIBELANT.

An entry in the books of one furnishing materials to a contractor for the repair of a vessel, showing that such materials were furnished to the vessel, is in the nature of a self-serving declaration, and without weight in determining the right to a lien.

In Admiralty.

Bryan & Bryan, for libelants.

Buist & Buist and J. N. Nathans, for respondent.

BRAWLEY, District Judge. These cases were heard together, and the controversy arises out of a contract for repairs of the steamer

Sappho, owned by the respondent company, a corporation duly chartered by the state of South Carolina for conducting a ferry between the city of Charleston and Mt. Pleasant and Sullivan's Island; the Sappho being employed in such service. The libelant in the case first entitled is a shipwright, and the libel claims a balance due for work done and materials furnished in such repairs. The libelants in the second case are merchants, and their claim is for materials furnished to the first named libelant, and used by him in the repairs. Mr. C. O. Witte is chairman of the board of directors of the respondent company, and as the case has given rise to unfortunate differences of opinion, and an apparent conflict of testimony between Mr. Pregnall and himself, it may be as well to say that both are men of the highest character, and neither would knowingly state what was untrue. A contract in writing and under seal was entered into February 25, 1897, between the libelant Pregnall and the company. This contract is not referred to in the libel, but is set up in, and made a part of, the answer; and a proper understanding of the questions raised requires its consideration. An inspection of it shows that at the time it was entered into the precise extent of the repairs needed was not entirely known. The first clause provides for such as were specifically known, and embraces 11 items in all. The second clause provides for the payment of the sum of $2,000 for the work and material embraced in the first clause, upon certificate that there are no liens of any kind on account thereof. The third clause provides for such additional repairs as it was supposed would be found necessary, but, as the exact amount thereof was not known, the three items embraced therein were to be paid for as follows: (1) The taking out of defective and substituting of new timber, "such as floors, futtocks, and top," at $1 for the running foot; (2) replacing of ceiling, at 30 cents for the running foot; (3) the taking out of defective planking, and renewing same, at 60 cents for the running foot. The fourth clause provides for the payment of amounts found to be due under the third clause, upon certificate of no liens. The fifth clause provides that all the material furnished and work done under the first and third clauses shall be of the best quality, and subject to the superintendence and approval of the company, and also of the United States inspector of hulls. Having thus provided for the known and for the probable needs of the vessel, provision was made for the unknown and possible needs in the sixth clause, which is as follows:

"Sixth. No new work of any description done on the said steamer, or any work of any kind whatever, shall be considered as extra, unless a separate estimate in writing for the same, before its commencement, shall have been submitted by the contractor to the proprietor, and the signature of the chairman of its board of directors obtained thereto; and the contractor shall demand payment for such work immediately after it is done. In case of day's work, statement of the same must be delivered to the proprietor, at latest, during the week following that in which the work may have been done; and only such day's work and extra work will be paid for, as such, as agreed on and authorized in writing."

The controversy comes from an alleged agreement subsequent to the written contract, which it is claimed was made between S. J. Preg-

nall, the contractor, and C. O. Witte, the chairman of the ferry company,—an agreement positively asserted on the one side, and as positively denied on the other. It occurred in this wise: After the Sappho was put on the marine railway of the contractor, and stripped, as appears from the testimony of Cherry, the master, she was found to be in worse condition than he expected. He discussed the matter with Mr. Bird, one of the directors, and told him that he thought it would be cheaper to cancel the contract with Pregnall, and get him to build a new hull, which he thought would cost about $10,000. Bird advised him to see the president. He went down to see him, and informed him of the condition of the boat; and his reply was that he was sorry he had not known it sooner, and that they would have to do the best they could. After informing Pregnall of this conversation, they went down together the next day to Mr. Witte's office, and Mr. Pregnall gives this account of the interview: After saying that the vessel would have to be rebuilt, in reply to the question, "Did you describe this condition of affairs?" he answers:

"I did, and so did Captain Cherry. After consulting a time, he wanted to know if I could do that work in time to save the season; he then considered the cost of a new boat against rebuilding that one. I suggested that by taking out the machinery I could save $4,000 or $5,000. I did offer to build a new boat—hull—for $11,000. They decided then that I should go on, and make the old hull new. Mr. Witte told me, 'All right; go ahead.' I told him I did not have the means to do that much work. He said he would furnish me the means every week to pay my men, which he did, and I went along with the work and completed it."

And this is Mr. Witte's account of the same interview: In reply to the question whether he remembered the occasion, and to state just what occurred, he answers:

"I remember it distinctly. Capt. Cherry and Mr. Pregnall came down to the office, as they said that the vessel was not in as bad a condition as represented by some people,—making mention of some certain parties at the time,—and that she could be repaired, and be a stronger and stouter vessel than before; stating that, putting these keelsons on, and which were in the contract, the vessel would be stouter and better than before. The question about how much it would cost to build a new hull came up in this way: As some people said it would be cheaper to build a new than repair the old, this was reported to me that such had been said; and I asked Mr. Pregnall how much could we build a new hull for. and he said $11,000, and I said, 'Well, I was told it could be done for $8,000 or $9,000.' He said his price was $11,000."

Replying to the question, "Did you, in consequence of that conversation, say, 'All right; go ahead'?" he answers:

"No; I told them after that that we concluded to go on with the contract, —that was the result of the conversation,—and finish the vessel, and finish it in the time agreed upon; and not a word was said about the boat, and that the ferry company had plenty of money. Everybody knew it hadn't. And I had no occasion to say the bank had plenty of money. Everybody knew it had."

The last part of this answer obviously refers to testimony previously given by Cherry, wherein, in replying to questions as to why he had acquiesced in certain work being done which was outside the contract, he had said that it was because Pregnall had informed him that he

was authorized by Mr. Witte to do it, and supposed he had made a written contract, and had repeated as Mr. Witte's some expressions of this nature. Capt. Cherry, the only witness present at this interview, replying to the question, "At the time that Mr. Pregnall went with you to C. O. Witte's office, did you understand from what Mr. Witte said in Mr. Pregnall's presence that he was authorized to do any work he pleased outside of this contract?" answers, "No." "Question. Did C. O. Witte authorize Mr. Pregnall to do any work outside of this contract? Answer. Not as I know."

The above is substantially all of the testimony contained in the record relating to what occurred at the interview wherein it is claimed that the old contract was set aside and a new one entered into, and the precise question to be determined is whether it is sufficient evidence to support the contention. The old rule of the common law laid down in the Countess of Rutland's Case, 5 Coke, 25b, that "every contract or agreement ought to be dissolved by matter of as high a nature as the first deed," has been so far refined by distinctions intended to mitigate its rigor in particular cases, and so chipped away, as to be no longer controlling; and it may now be considered settled that the terms of a contract under seal may be varied by a subsequent parol agreement; that, where there is nothing in the nature of the contract itself requiring it to be in writing, there is no principle which requires the new one to be in writing; and some courts of high authority say that attempts of parties to tie up by contract their freedom of dealing with each other are futile. But, where parties have bound themselves by a written agreement, that agreement remains, and must be the measure of their rights, unless both parties agree to an abandonment or dissolution of it. Mere negotiations for a variation in the contract will not amount to a waiver of it; for, as every contract is the result of an agreement of minds, a like agreement of minds is needed to dissolve it. Unless both parties in such negotiations understand alike, there is no meeting of minds, no contract; or, as Mr. Justice Miller says in Wheeler v. Railroad Co., 115 U. S. 34, 5 Sup. Ct. 1063:

"It is to be observed that to annul or set aside this contract, fairly made, requires the consent of both parties to it, as it did to make it. There must have been the same meeting of minds, the same agreement to modify or abandon it, that was necessary to make it."

That Mr. Pregnall understood that the old written contract was abrogated in so far that he was thenceforth to go ahead and do all the work that he thought necessary is clear, but that is not enough. It takes two to make a contract, or to unmake it, and Mr. Witte says positively that he did not make any agreement or give any authority to do any work outside the written contract. Capt. Cherry, the only witness present at the interview, says that he did not understand that any agreement was then made for any work outside the contract. This evidence falls very far short of the proof necessary to support a contract, nor is its exiguity strengthened by the doctrine of probabilities. The chairman of the board of directors of this company is a cautious business man, who but a week or two before had required its

89 F.—24

attorney to reduce to writing, with great particularity, every item of repairs known to be required, and provided with equal precaution for every item that would probably be required, and for the unknown but possible repairs had stipulated expressly that no new work of any kind whatever should be done, unless a separate estimate should be submitted by the contractor to the company, and the signature of the chairman obtained thereto,—a stipulation which the testimony shows was expressly brought to the attention of the contractor; and the court is asked to believe that without any stress of extreme urgency, without any new consideration, he agreed to abandon all those limitations and safeguards which the company, through its attorney, had thought necessary to incorporate into a written and formal contract, —to open the doors, in other words, for an expense of which there was no calculation, and of which the only measure was the will of the contractor. The weight of proof and the weight of probability are against such contention. The true explanation is probably this: It appears from the testimony that Capt. Cherry, when he discovered that the condition of the Sappho was worse than was expected, had so reported to the chairman of the board, and had talked with him, as he had with others, of the advisability of building a new hull, and of abandoning the contract for the repairs of the old one; but at the second interview Mr. Witte says he reported that it was not as bad as he had thought the first day. This was the interview at which Mr. Pregnall was present; and although there was some talk of building a new hull, and of the cost of it, the conclusion was to go on with the repairs of the old one; the understanding of two of the parties being that the repairs were to be made in accordance with the existing contract, and the understanding of the contractor being that he was authorized to do such additional work as the exigencies required. As explanation of the reasons why this new contract was not put in writing, Mr. Pregnall says that he would not insult Mr. Witte by asking him to put his contract in writing; but why Mr. Witte should be insulted by being asked to do what he had expressly stipulated should be done is not explained.

Being fully satisfied that there was no formal agreement to renounce the old contract, it remains to consider whether the parties are estopped by their conduct from setting up the contract. Cases of high authority have been cited to support the proposition that parties may renounce a contract in any way they see fit, and that they can substitute a new oral contract by conduct and intimation as well as by express words. Bartlett v. Stanchfield, 148 Mass. 394, 19 N. E. 549; West v. Platt, 127 Mass. 367; O'Donnell v. Clinton, 145 Mass. 461, 14 N. E. 747. Passing by the question whether a corporation would be thus affected unless there was some proof that the conduct of its officer or agent was within the scope of some delegated power, let us see whether there is such proof of acquiescence or ratification as will estop this company. That the new work was done with the acquiescence and approval of Capt. Cherry is not denied. Whatever may be the powers of the master of a vessel in a foreign port to bind his ship by his contracts for repairs, it cannot be claimed that he had

any such power here. His vessel was out of commission, and, though there seems to have been an understanding that he was to exercise a sort of supervision over the repairs to be made under the written contract, it is not contended that he had any power to make or renounce such contract; and his testimony is that, in so far as any work was done which was not embraced in the written contract, his acquiescence therein was due to the statement of the contractor that he had special authority from the chairman of the board of directors. Acquiescence under such representations cannot bind the company. There is no proof of any knowledge on the part of the chairman of the board of directors of any work being done outside of the contract until after it was completed, and where there was no knowledge there could be no acquiescence. There is testimony that on May 5th he wrote a letter to Capt. Cherry, telling him to inform Mr. Pregnall that some joiner work was not authorized by him, and that unless they could come to a written agreement he would ask for estimates from other parties; and his testimony is that until the bill was handed to him he was not aware that any work had been done which was claimed to be extra and outside of the written contract. The case does not fall within that class of cases where persons standing by and seeing work done from which they receive benefit are estopped from denying their obligation to pay for it, or where failure to respond to inquiry is sometimes held to be some small evidence of want of good faith. There can be no estoppel from the mere silence of one of the parties to a contract, when by its terms nothing remains to be done until the time for payment comes. Silence, to create estoppel, must be inconsistent with any other explanation. An ingenious effort is made to piece out the paucity of proof on this line by showing that all of the extra work was necessary in order to make the vessel safe and sound, and as the work was done under the supervision of the United States inspector of hulls, and was thought by him to be necessary, the company is therefore bound. Sections 4445, 4448, 4453, 4454, defining the duties of such inspector, etc., are cited. They do not seem to me to have any bearing upon the point of this controversy. They denounce certain penalties and privations against masters and owners who fail to comply with the law which is intended to secure safety in navigation, and the inspector was clearly within the law, in pointing out any defects and imperfections which became apparent upon his inspection, and which tended to render the vessel unsafe. If the master or owner failed to comply with his requirements, certain penalties are imposed; but he cannot interfere with an owner's liberty of contract for such repairs, or make or unmake contracts for him, which is the question here. The case of Cunningham v. Fourth Baptist Church, 159 Pa. St. 620, 28 Atl. 490, is cited as being on all fours with this. I do not so consider it. This was the case of a corporation which entered into a written contract for certain alterations and additions to its buildings, and there was a provision that no work should be paid for, unless agreed to in writing signed by the parties. During the progress of the work a certain change in the structure of the stonework, which, in the language of the court, was "prompted by considerations

of safety, and ordered by officers of the city, invested to a certain extent with the police power of the state, as to which neither the owner of the building nor its architect or contractors could exercise any option, and which had to be obeyed, was obeyed," necessitating an increased expenditure. The changes were made under the plans and direction of the architect of the defendant corporation. It was decided that the plaintiffs were entitled to recover for the expenditure incurred in this extra work, the court saying, "They did so in good faith, with the knowledge and acquiescence of the corporation defendant, and under the direction of its architect." This case would furnish a rule for guidance if there was any proof that the inspector of hulls had furnished a statement of the needed repairs, and the ferry company had instructed its architect or agent to prepare the necessary specifications, and had acquiesced in and accepted the work with full knowledge; but there is no such proof, there being no knowledge or acquiescence, except by Cherry, which it is claimed was due to misrepresentation. It would serve no good purpose to review in detail the great number of cases cited by the learned counsel for libelant. The one just referred to seemed to be considered the strongest in support of his view. That extra work, when ordered, must be paid for; that a verbal contract may supersede a written one; that parties may sometimes, by conduct, by acquiescence, or by ratification, be bound, even in the absence of contract,—are abundantly established by them; but, conceding that they do establish the principle to the fullest extent claimed, they do not help to the solution of the pivotal question, which is whether, in the absence of sufficient proof of agreement, knowledge, acquiescence, or ratification, a party to a written contract is bound to pay for extra work when there is an express stipulation that he should not be so bound except under the conditions admittedly unperformed.

Appeal is made to the principles which govern courts of admiralty in the exercise of their jurisdiction; that they are not bound by the strict rule of the common law, and can determine cases submitted to their cognizance upon equitable principles, and according to the rules of natural justice. It needs hardly to be said that, as a question of conscience, no man ought to get the benefit of another's labor without paying for it; and counsel know that I have strenuously urged upon them a settlement of this case out of court. While a court of admiralty construes instruments as a court of equity does, with a large and liberal indulgence, and while, in the large majority of cases which come within its cognizance, it has both the right and duty to do what it conceives to be justice, yet in matters of simple contract, where parties legally competent have bound themselves in an agreement whose terms are so plain that there is no room for construction, it is bound, as all courts are bound, to compel performance, and has no dispensing power. Mr. Justice Swayne says in The Harriman, 9 Wall. 173:

"The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is the province of the courts to enforce contracts, not to make or modify them."

There is nothing in this contract which makes it peculiarly a subject of admiralty cognizance. It is like the old action of assumpsit on a quantum meruit. A change of forum does not alter the rules of law which must govern its determination. It appearing that the money due upon the written contract has been fully paid, an order will be entered dismissing the libel, but without costs.

The libel of William M. Bird & Co. will next be considered. It was expressly stipulated in the agreement between Pregnall and the ferry company that all the materials and supplies should be furnished by the contractor, and that, before any payments were to be made, the contractor was to furnish a certificate that there were no liens of any kind whatever upon the vessel. The testimony shows that Bird was a director and the secretary of the ferry company, and his partner, Welch, read the contract. The vessel was in her home port. Under the general maritime law there is an implied lien for supplies furnished to a vessel in a foreign port upon the order of the master, there being a presumption that they are furnished on the credit of the vessel; for, as was said in an early case:

"The vessel must get on," and "the necessities of commerce require that, when remote from the owners, he [the master] should be able to subject the owners' property to that liability without which it is reasonable to suppose he will not be able to pursue his owners' interests." The Aurora, 1 Wheat. 96.

As no such necessity could be supposed to exist in the home port, it was long held that this lien for supplies did not attach at the home port of the vessel. To obviate this apparent injustice or inequality, many of the states have passed laws giving to their residents liens upon vessels for labor performed or materials furnished. Of this class of statutes is that contained in section 2504 of the Revised Statutes of South Carolina. These liens have been repeatedly held to be valid and enforceable by proceedings in rem in the admiralty courts of the United States, as being maritime in their nature. It is only because they are of this nature that courts of admiralty would have jurisdiction to enforce them. The Lottawana, 21 Wall. 568; The Planter, 7 Pet. 343; The J. E. Remble, 148 U. S. 1, 13 Sup. Ct. 498; The Kate, 164 U. S. 470, 17 Sup. Ct. 135; The Glide, 167 U. S. 610, 17 Sup. Ct. 930; The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 402,—contain elaborate discussions of the principles which govern the courts of the United States in this class of cases. The conclusion reached by me, as the result of them all, is that liens created by state laws for repairs and supplies in the home port are accorded the same precedence as liens for repairs and supplies in a foreign port under the general maritime law; that the true limits of maritime law is a judicial question, and no state law can enlarge or narrow it; that, in enforcing such liens given by the state law, the courts of the United States are governed by the principles and restrained by the limitations which ordinarily attach to liens in admiralty; that these liens all rest upon the principle that the supplies are furnished to the ship upon the credit of the ship herself, to preserve her existence and secure her usefulness for the benefit of all having an interest in her;

that by enforcing the liens the courts do not adopt the statute itself, or the construction which courts of common law or equity might place upon it when they apply it, but put them upon the same footing with all maritime liens, as if they are created by maritime law, and, inasmuch as liens are allowed under the maritime law because they are presumed to have been furnished on the credit of the ship, it must follow that whenever it clearly appears that they were furnished either upon the credit of the owner or upon the credit of the contractor there is no lien upon the ship. If these conclusions are correct, Bird & Co. can have no lien. The contract between Pregnall and the ferry company is inconsistent with the claim of a lien upon the vessel, for it is expressly stipulated that there should be no lien. Bird & Co. furnished supplies to the contractor, and were aware of the fact that by the terms of this contract Pregnall was to furnish the supplies, and that there was to be no lien on the vessel therefor. That they made an entry in their books that the supplies were for the Sappho can make no difference, for the courts have repeatedly held that this is a mere self-serving practice, of no weight in the determination of the question. I am of the opinion that there is no lien, and the libel must therefore be dismissed, with costs.