## THE GLENDALE.

## THE GLENDALE et al. v. EVICH.

### (Circuit Court of Appeals, Fourth Circuit. July 10, 1897.)

### No. 215.

1. ADMIRALTY JURISDICTION—STATUTORY LIENS—ACTION FOR WRONGFUL DEATH.
    A state statute giving a right of suit in rem against a vessel wrongfully or negligently causing the death of any person (Code Va. § 2902) creates a lien, and may be enforced by a libel in rem in the federal courts, when the accident occurs in waters of the state navigable from the sea. 77 Fed. 906, affirmed.

2. ADMIRALTY APPEALS—WEIGHT OF EVIDENCE—EFFECT OF DECISION BELOW.
    When all the testimony in the cause has been taken, not before the judge below, but before a commissioner, and is all before the appellate court in his report, that court must examine it for itself, and reach its own conclusions.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was a libel in rem by Phillip B. Evich, administrator of Joseph Evich, deceased, against the steamtug Glendale, and Horace Furman and E. J. Furman, composing the firm of Furman Bros. (owners of said tug), to recover damages for wrongfully causing the death of the said Joseph Evich. The district court rendered a decree for the libelant (77 Fed. 906), and the owners have appealed.

William Flegenheimer, for appellants.

H. R. Pollard and Conway R. Sands, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

SIMONTON, Circuit Judge. This is an appeal from the district court of the United States for the Eastern district of Virginia, sitting in admiralty. The libel is filed by the administrator of Joseph Evich, deceased, against the steamtug Glendale in rem. The alleged cause of action is the death of libelant's intestate, arising from the collision with the said tug.

The first question is: Has the court, sitting in admiralty, in the Eastern district of Virginia, a jurisdiction in rem for a tort resulting in the death of the person injured? In The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, the supreme court discusses this question. After an elaborate and full review of all the cases reported, the court decides that no such proceeding can be maintained in admiralty in the absence of a statute giving the right; and the court expressly reserves the question whether such a right having been given to the state courts, the federal courts sitting in such state can exercise it in admiralty. In The Corsair, 145 U. S. 335, 12 Sup. Ct. 949, the question is again fully and elaborately discussed, and the authorities, American and English, reviewed. And it is stated that, by the last and most

authoritative decision in England (The Vera Cruz, 10 App. Cas. 59, etc.), the law is now settled in that country that admiralty has no jurisdiction to proceed in rem in such cases. The law of this country is thus declared:

"A maritime lien is said by writers on maritime law to be the foundation of every proceeding in rem in admiralty. In much the larger class of cases the lien is given by the general admiralty law, but in other instances, such, for example, as insurance, pilotage, wharfage, and materials furnished in the home port, the lien is given, if at all, by the local law. As we are to look, then, to the local law in this instance for the right to take cognizance of this class of cases, we are bound to inquire whether the local law gives a lien on the offending thing. * * * Unless a lien be given by the local law, there is no lien to enforce by proceedings in rem in admiralty."

In this case the court had no jurisdiction, because the law of Louisiana, in which state the action was brought, did not create a lien. It is true that this case is somewhat negative in relation to the proposition. But it is clear from its reasoning that, if the lien be given by the local law, it will be enforced in admiralty. This is in accord with the general rule as to liens given by a state statute. The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498. It is in close analogy to the remedy given by the state statutes to material men in the home port.

The jurisdiction therefore depends upon the Virginia statute. The provisions upon this subject appear in sections 2902 and 2903 of the Code of Virginia, and they settle this question in favor of the jurisdiction of the court:

"Sec. 2902. When Suit may be Maintained on Account of Death of a Person Caused by Wrongful Act of Another. Whenever the death of a person shall be caused by the wrongful act, neglect or default of any person or corporation, or of any ship or vessel, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action, or to proceed in rem against the said ship or vessel, or in personam against the owners thereof or those having control of her, and to recover damages in respect thereof, then, and in every such case, the person who, or corporation or ship or vessel which, would have been liable if death had not ensued, shall be liable to an action for damages, or, if a ship or vessel, to a libel in rem, and her owners or those responsible for her acts or defaults or negligence to a libel in personam, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony.

"Sec. 2903. How and When to be Brought; How Damages Awarded; New Trials. Every such action shall be brought by and in the name of the personal representative of such deceased person, and within twelve months after his or her death. The jury in any such action may award such damages as to it may seem fair and just, not exceeding ten thousand dollars, and may direct in what proportion they shall be distributed to the wife, husband, parent and child of the deceased. But nothing in this section shall be construed to deprive the court of the power to grant new trials, as in other cases."

The learned counsel for the appellants contends that the state statute must create and give a lien in advance and in express terms. The Corsair, supra, says that we are bound to inquire whether the local law gives a lien on the offending thing. The Virginia statute declares that "the person who, or the corporation or ship or vessel which, would have been liable if death had not ensued, shall be liable

to an action for damages, or, if a ship or vessel, to a libel in rem." A libel in rem proceeds upon the idea of the existence of a lien. "Whenever a lien or claim is given on a thing by the maritime law,"—and, as has been seen, the lien created by the local law is administered in admiralty on the same principles as maritime liens,—the admiralty will enforce it by its process in rem, and it is the only court competent to do this. It is much more than a right to sue. It is jus in re, a right in the thing itself, without actual possession or any right of possession, and can be executed and devested only by process in rem, and is treated as a proprietary right. Henry, Adm. Jur. & Proc. § 41.

This brings us to the facts of the case. The Glendale is a small tug, 41 feet long, 8¾ feet beam, propelled by steam, and engaged in towing in and about the James river. The intestate of the libelant was with his father, the libelant, and two other men, fishing with a seine in the James river, between Richmond and Manchester, on the afternoon and evening of the 7th June, 1896. On that evening, the Glendale, proceeding down the river, came upon the small boat in which these persons had been fishing. When she came close to the boat, Evich, the libelant, caught the rail of the tug, and jumped out of his boat into the tug. One of the men, Coleman, took the boy Joe Evich by the hand, and reached out and got on the tug. Somehow his grasp on the boy was loosened, so that the boy got away from him; probably was sucked under the tug, and was drowned. He was about 12 years old. The small boat had no light. It was about 14 feet long, about 5 feet wide in the center, its greatest beam, pointed at the bow, with a square stern and a flat bottom. These facts are undisputed. By whose fault the sad accident occurred is the question in the case. The testimony is very voluminous. The number of witnesses examined out of all proportion. The evidence is contradictory to a great degree. The district court decreed in favor of the libelant. Ordinarily, this would have had great and controlling weight if the witnesses had been examined in the presence of the court. The Thomas Melville, 37 Fed. 271; The Holberg, 43 Fed. 120; Duncan v. The Gov. Nicholls, 44 Fed. 302.

The rule and the reason of the rule are stated in The Alejandro, 6 C. C. A. 57, 56 Fed. 624:

"The rule is well settled that in cases of appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses and judging their appearance, manner, and credibility, will not be reversed, unless it clearly appears that the decision is against the evidence,"—quoting The Albany, 48 Fed. 565, quoted and followed in this circuit; The Lucy, 20 C. C. A. 660, 74 Fed. 572, and 42 U. S. App. 100.

But all the testimony in the case was taken before a commissioner, and it is before us in his report. We must examine it for ourselves, and reach our own conclusion. The three men in the small boat, Evich (the libelant), Coleman, and Ebenhack, testify to about the same effect. The last says that they were fishing with the seine out on the Manchester side of the river, and saw the tug coming towards them when she was some three or four hundred yards away. They

hallooed, but the tug apparently paid no attention. They pulled towards the Manchester side of the river. The tug seemed to be coming right at them. Then Evich told Coleman, who was rowing, to pull towards Richmond. The tug came near. Coleman jumped from the boat with the boy. So did Evich. The tug struck the boat. The witness Ebenhack remained in her, and, when she tilted at the blow, he righted her. When they missed the boy, he paddled about, hunting for him; afterwards took Evich and Coleman from the tug, and they went in the boat, which was half full of water, to Richmond. He says that the tug struck the boat four or five feet from the bow, running at full force.

Coleman says that "they had taken the seine up, and made way back to Richmond, when they saw the tug between a hundred and fifty yards from us. That they commenced to get out of the way of it, and found that they could not. Every way we would turn he would turn into us. It seems to me like he had to run into us. I saw he was coming so straight into us every way we tried to shun him. Then, after, I found out that I couldn't shun him." He adds that, when he got on the tug, "then the captain of the tug, I don't know which one was it, but it was one of the men on board the tug, he said, 'You had no business to leave Richmond to-night, anyway.' Then he said to Mr. Evich that, if he had known it was him, he wouldn't have had it happened for a thousand dollars." He does not say anything of the speed of the tug or of the character of the blow.

Evich says:

"We started away from the house at 6:30 on Friday. We took a boat owned by myself, for a horse went down with the trouting lines and seines. We put out a trouting line, and then we went and hauled a seine. We started the seine out on the Manchester or Chesterfield side, and our seine reached a little better than halfway across the river. We came pretty close to the vessel, which was lying at the Chemical Works, and, just about the time we got it all out, my unfortunate boy saw the tugboat from Richmond coming down. He told me: 'Papa, you had better pull up this end. There is a tugboat coming down. I see it turning around.' It seems to me that the tug, when I saw it, was about the Clyde wharf,—was sitting across the river. I do not know if it was turning around, or he was stopping there. The end of the seine that I had just put out at the time reached about in the channel, but I thought that probably we would be out of the way of anything that goes up and down the river, as steamship or sailing vessel. But I told the colored man to back up. The boat begins to sink. And then I started to pull the seine up. I saw that I was in close range with the buoy which lays in the middle of the river, but I saw that this tugboat was coming down like a steamer without a rudder, or in a way that looked like nobody took care of it. I pulled up my seine altogether. Then I was clean over on the Chesterfield side. I saw this boat that was coming down so crooked and unruly that, when I saw it about three or four hundred yards, I began a hallooing, and I could not go any further to the Chesterfield side. I was close up to the posts, and it seems to me the boat steered backward and forward; and when we got in close quarters, about fifty yards, I saw the boat as well as I see you now, and I begged the captain, before his God, to reverse his boat, but he did not pay any attention to it. And when he got much closer, he sheered right into me, on the Chesterfield side, and I called my oarsman to pull up the other way. The boat was under my rule all the time, and, when I told him to go the other way, it seems to me that he put his wheel hard a-starboard,, and he struck me six feet from the bow. The boat is 18 feet long, four feet wide at the top, and three foot six inches at the bottom. I saw several fishermen around me, and I saw a few

men that were fishing off the Chesapeake dock with their tight lines. When the boat struck me, I told the captain, 'What are you trying to do, you brute you?' When he struck me, he threw me right out of the boat entirely; and, in falling down, I threw my left hand on his rail. He drove me through the water, hanging on one hand for some time, and then some one came out of the boat, and helped me on board, after hallooing for some one to save me. I was just getting ready to let go when they gave me assistance. Then I got on the boat. When I got on the boat, I saw two men and a boy. That I could not swear the boy's age, but he was a good-sized boy. The man in the engine-room, who, I suppose, was the engineer, shook his fist in Capt. Craddock's face, and told him that he did not have any business to leave Richmond, and he said, 'I told you not to leave Richmond.' "

The libelant also introduced evidence tending to show that the master and the engineer of the tug were not sober the afternoon of the occurrence. No evidence whatever is in the record tending to show malice or bad feeling on their part towards libelant. On the other hand, the witnesses for respondent give an account of the affair essentially opposite. Brittain was on the Glendale when the accident happened. He was employed as cook and deck hand. The master of the tug came aboard of her at her dock about a quarter to 8 p. m. At that time witness had put up the four regulation lights, which were burning brightly. The master eat his supper, and then the tug went up to the locks to see the master of a sand barge, which he had agreed to tow. The tug master promised to call for him as soon as he had finished the tow of the schooner Reese, which was at the Chesapeake docks. He finished his tow of the Reese, and then went to the sand barge, and carried her down the river. The collision with Evich's boat occurred after the tug had left the sand barge, and while she was on her way to tow the Reese. This witness thus describes the accident:

He was forward, watching. "8th question: You stated that you were on the forward watch going down the river at or about the time of the collision. If that is so, please state when you discovered the rowboat that Mr. Evich and others were in; what distance the rowboat was from the tug at the time you first saw it; how many men you saw in her; whether or not you heard any one hailing your tug or hallooing. A. It was about ten or eleven yards from the tug. I heard them halloo just as I saw the boat. I saw three men in it. I told the captain that there was a boat ahead, to sheer to the Richmond shore; and he saw the boat just about the time that I did, and gave bells to go back on the boat. They kept rowing right across our bow all the time, and we struck her eighteen or twenty inches from the bow of the rowboat. Two men jumped overboard. One caught on the bow, and climbed up. He was a colored man, and a white man caught on the side of the boat opposite the pilot house, and I caught him, and pulled him aboard. The other man remained in the boat. He was sitting in the stern of the boat. 10th question: When the rowboat was struck, did she sink or turn over or fill with water? Also please state in connection therewith what happened to the man that remained in the boat, if you know it. A. No, sir; she never sunk or turned over either, nor never dipped a drop of water in it, as I could see, anywhere. The light on the flag pole shone down in the boat and I could not see any water and the man remained setting on the stern seat without getting hurt or injured in any way. 11th question: Please state, as far as you know, which way your tug was steering down the river, whereabouts in the river or the channel of the river you were when the collision took place, and state whether you were in deep water or shallow water. A. It was near the middle of the channel, as you could well tell in the night. We were about 200 yards below the chemical

works, as near as I can come at it, and were going down the river. We were in deep water."

He positively denies that the master was intoxicated or under the influence of liquor any part of the time.

Furman, the engineer, gives this account:

"It was about eight o'clock when the captain came aboard. I had up a little steam, and he was eating his supper when I first saw him after he came aboard. Then I told the steward to put up the lights. The steward's name is James Brittain. After the captain's supper, we got under way, and went up to the lock gates. I should have said the sand lighter instead of the lock gates, as it was standing right alongside the gates. It was about half-past eight when we were at the lighter. What passed between Captain Craddock and the captain of the lighter I know nothing about. I was in the engine room, and did not hear anything that passed between them. Capt. Craddock was perfectly sober when he came aboard of my boat. While on our way to the Chesapeake dock, to dock the schooner James J. Reese, I received three bells, which caused me to reverse my engine. Then I looked out of the engine-room door, and saw the tug sheering towards the Richmond shore. Then I felt the boat careen over to one side. Then one bell was rung, and I stopped my engine. I went on deck, and saw two hats floating on the starboard side of my boat. I called to James Brittain to bring me a life preserver. The captain, Captain Craddock, looked out of the pilot-house door, and says, 'There is no one overboard.' Then I went forward, and I saw him talking with a man beside of the pilot house on the starboard side, and also saw a man on the bow of the boat. Captain said to Mr. Evich (I suppose he is the man), 'Why in the world did not you have a light?' He says, 'One cent's worth of oil would have prevented all this.' Then Mr. Evich or the man says, 'It is not sundown yet.' Mr. Craddock then looked in the cabin where the light was burning beside the clock, and said, 'It is twenty minutes to nine o'clock, and you say it isn't sundown yet.' Then the man on the bow hallooes for Joe. Then I says, 'Is there any one overboard?' He said nothing in reply, but hallooed for Joe. I couldn't find out whether it was a man overboard or a boy, or a white man or negro. Then I looked to the side of the boat, and saw a small rowboat with one man in it. He was sitting on the stern seat when I saw him. He got up in the boat, took one of the oars that was in the boat, and I says to him there is the other oar about ten feet over there. He paddled over, and got his oar. He came back; and, from the light on our flag pole, I saw that there was no water in the boat. Then he took these two men off our boat, but before he took them off, after I found there was some one drowned, I told him I wouldn't have had it happen for a thousand dollars. I says, furthermore, 'I would sooner have sunk my boat here in the river, because,' I says, 'I could get my boat up, but it will be impossible to get back the person's life.' Then the man that was in the boat took the men off. I asked them if there was anything we could do to help them, and they told me there was not. Then we passed on, and went down to the Chesapeake dock, and got the schooner James J. Reese, and fetched her up to the,—what is known as the old powder shed. That's about all about it."

He also denies that either the master of the tug or that he himself was under the influence of liquor, or had been drinking.

The master of the tug makes this statement:

"Then we turned loose from the dock by the Warwick Park Shed, and from there I went up to the sand barge in the tug, and asked the captain of the sand barge if he was ready to go down the river. He told me, 'Yes,' he was ready; and I told him I had to dock the schooner James J. Reese, and, as soon as I docked her, I would come and get him, and he said 'All right.' So, I got him to Curl's Neck by seven o'clock next morning. I then left the sand barge, which was about half-past eight o'clock, and started down to the Chesapeake dock. Going down to the Chesapeake dock, I had a boy out forward on the

lookout, because there were always in the summer time lots of boys swimming around out in the river, for which I have had to stop my boat several times. After I got about 150 yards, or maybe 200 yards, as near as I could tell, below the Richmond Chemical Works, I heard some one halloo, and the boy said to me, 'There's a boat right ahead, Captain,' which I saw about the same time that he did. They were not exactly ahead of me, but very near; and I stopped the boat, and went back on her, and had her engines reversed, starboarded my wheel, and sheered off from them all I could; but they continued to row, until they got about two feet of their bow across ours. Then, the engine being reversed, the tug had lost all of her headway, so that I could not sheer off from them any further; and, when the tugboat had gotten within four or five feet of them, two men stood up in the boat, and made a leap for the tug. One man caught on the bow or side of the bow, and the other one caught opposite the pilot house, which was about ten feet from the bow. One of the men remained in the boat. Soon after they jumped from the boat, our boat came up against the bow of their boat, about two feet from the stem, which caused her to swing alongside of the tug, and then I saw the two men alongside of the tug. One the boy pulled aboard. He was a white man, which has proved to be Mr. Evich, and the other was a colored man, who is known as Richard Coleman. The other man, the one that remained in the boat, was Mr. Ebenhack. I asked Mr. Evich why was it he did not have a light in his boat; that one cent's worth of oil would have avoided the accident. His reply was to me that it was not sunset. I then looked down the cabin at the clock, and it was twenty minutes to nine o'clock. I suppose he had then been aboard as much as five or ten minutes. Then I heard Richard Coleman halloo, 'Joey!' And I asked them if there was any one overboard, and they did not make me any reply, but continued to halloo, 'Joey!' But before they commenced hallooing 'Joey!' the engineer came out of the engine room, and asked the boy to give him a life preserver, and I told him there wasn't any one overboard. That was the time, or pretty soon after that time, that this colored fellow hallooed 'Joey!' We stopped then as much as twelve or fifteen minutes, and helped look for the boy, but did not see anything of him. Mr. Ebenhack rowed around in his boat, and picked up two hats. Mr. Evich told him to come there, and let him get in the boat. When he came up aside of the tug, I looked in the boat, and there was no water in it. There was one tomato can and a seine and a bottle lying in the bottom of the boat. That was all I saw. Then they got in the boat,—Mr. Evich and Coleman,—off of the tug, and rowed ashore. I stayed there with the tug until after they had gotten ashore. Then I went down to the Chesapeake dock, took the schooner Reese in tow, and brought her up to Rocketts, at the old Powder Magazine Shed. Then I went up to the lock gates, got the sand barge, and went on down the river."

The witnesses on the tug put her speed at about five miles an hour. The master of the schooner, as also the master of the sand barge, corroborate the statement that the master of the tug was sober, and both say that he towed them skillfully on that night. There is conflict of evidence as to the distance at which objects could be seen that night. The accident occurred between 8 and 9 o'clock on a night in June. The electric lights on the banks of the river were lit. The master of the tug and other witnesses, notably the master and mate of the Reese, say that these lights made it difficult to see on the river, and that it was dark. The preponderance of the evidence is that the collision occurred in mid-channel.

This is a brief summary of the more important parts of the evidence. The narration of the witnesses for libelant is not credible unless the master of the tug was in a state of beastly intoxication. They say that the tug steered wildly, always towards them in whichever direction they moved, with the apparent intention of running them down;

and no motive whatever is shown for this. On the other hand, we find other witnesses, entirely disinterested, who swear that he was perfectly sober. We also find that at this very time he went about his business as tow master, gave a coherent, intelligent instruction to the sand barge, went and towed the Reese, and then finished his contract with the sand barge, to the satisfaction of both; that he had all his lights up; that he had a lookout forward, and, as soon as he had notice of the danger of collision, took prompt and successful precaution. It is absurd to say that he collided with the small boat at full speed. If he had done so, he must have cut her in two, or have run her down. There is great conflict of evidence on the point whether the boat was hurt at all. One thing is certain, she was able to carry three grown men ashore after the accident, and two of these got back in her from choice. Evidently, the men in the small boat lost their heads,—steered wildly. Instead of keeping on the Chesterfield side, where they were, they undertook to cross the river after they saw the tug coming, when she was 300 yards or 150 yards away. Having no light on her, a small boat, low in the water, it was not surprising that she was not seen until the tug was very near; and, when she was seen, the tug controlled her movement so completely that two men on the small boat could catch hold of her rail, and get on board.

This small boat had no light, although it was long after sunset. Section 4233, rule 12, Rev. St. U. S., requires such boats to have a light while navigating a river. This being so, it was incumbent on libelant to show that the absence of a light could not have contributed to the disaster. Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault in itself is sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel."

Considering this mass of testimony, and reconciling, as far as possible, the contradiction in it, having due regard to the preponderance of evidence when it is irreconcilable, we think that the district court erred in its conclusion. The decree of the district court is reversed, and the cause is remanded, with instructions to dismiss the libel, with costs.