## THE SAPPHO.

(Circuit Court of Appeals, Fourth Circuit. May 2, 1899.)

### No. 291.

1. APPEAL IN ADMIRALTY—REVIEW OF QUESTIONS OF FACT.

   Where the evidence in a suit in admiralty is taken before an examiner, the decision of the trial court on questions of fact is not entitled to the same controlling weight as where the judge saw and heard the witnesses testify, and will be more readily reviewed by an appellate court.

2. CONTRACT FOR REPAIR OF VESSEL—EXTRA WORK—WAIVER OF WRITTEN CONTRACT.

   A provision of a written contract for the repair of a vessel, that no extra work should be done unless an estimate in writing was first made and submitted to and signed by an officer of the company owning the vessel, may be waived; and where, after the vessel was stripped to begin the work, it was found to be impossible to make the repairs specified in the contract without to a large extent rebuilding the hull, and after consultation with the officers of the company the contractor was told by the president to go on with the work, which he did, and under the direction of a superintendent employed by the company, and with the knowledge of its officers and directors, replaced all the rotten parts of the hull, and made the vessel sound and seaworthy, the company, having accepted the vessel, must be considered as having waived the written contract, and cannot invoke its provisions to defeat recovery for all work done not specified therein.

3. SAME—WAIVER BY CORPORATION.

   The fact that the owner of the vessel was a corporation, and took no formal action in the matter by its board of directors, would not prevent its being bound by the action of its officers, and the acceptance of the benefit of the contractor's work without objection.

Appeal from the District Court of the United States for the District of South Carolina.

J. P. K. Bryan, for appellants.

J. N. Nathans and Henry Buist, for appellees.

Before GOFF, Circuit Judge, and MORRIS and WADDILL, District Judges.

WADDILL, District Judge. These are two libels in rem against the steamer Sappho, her tackle, apparel, etc., owned by the respondent company, the Mt. Pleasant & Sullivan's Island Ferry Company, a corporation of South Carolina, conducting a ferry between the city of Charleston, Mt. Pleasant, and Sullivan's Island, in said state, the said steamer being employed in that service. The controversy arose out of a contract for repairs to be made upon the said steamer. The claim of Samuel J. Pregnall, libelant, contractor and shipwright, is for a balance due on account for repairs, labor, and supplies in the sum of $2,230.82. The claim of William M. Bird & Co., libelants, merchants, is for $867.43 for materials furnished for the steamer in mak-

ing such repairs. In the lower court all of the testimony was taken before a special examiner, appointed for the purpose, and upon the depositions so taken the two causes were heard together, and the district court, by order of the 30th of August, 1898, dismissed both libels. 89 Fed. 366. The libelant Samuel J. Pregnall, on the 25th day of February, 1897, entered into a written contract with the respondent company for making certain repairs to the said steamer Sappho, specifically set forth in said contract, and which work may be particularized as follows:

"Haul out the said steamer on the marine railway of said contractor; take out and renew all clamps; take out and renew main water-wheel beams; renew the guards, and also the mudsills all around the steamer; put in new breast hooks; put in two extra sister keelsons; put in two new extra standards, one in each side, with hog rods and one-half inch iron; strip off entire copper from bottom, reef out all old oakum, and recaulk entire vessel to deck; remetal with yellow metal or copper; straighten and plumb vessel while on railway, putting in 2,172 feet timber at $1.00, putting in 3,901 feet planking at 60 cents, 820 feet ceiling at 20 cents."

At the prices fixed in the contract, these items amounted to $6,-676.60. Under this contract, the libelant Pregnall regularly entered upon the work to be performed by him, and, after getting the steamer on the railway of his yard, and stripping her, it was found that her condition was much worse than had been anticipated, so much so that it was impracticable to go on with the work according to the contract; and thereupon, after conference with the libelant, the master of the steamer, the president of the respondent company, and the government inspector, other work was done, much of it to the hull of the steamer itself, not stipulated for in the contract, amounting to the sum of $2,539.17, made necessary by reason of the rotten, defective, and unsafe condition in which the same was found to be, in order to put said steamer in a proper and safe condition for service. No question was raised as to the performance of the work covered by the original contract, and the amount due thereon was fully paid, but the bill for the extra work was disputed as a whole, and the result was the filing of the libel herein; to which the respondents replied that all work set forth in the written contract had been fully paid for, and $308.35 in addition, and denied further liability, upon the ground that the extra work was not embraced in the written contract, and was not authorized. They further alleged that the work on libelant's part was unskillfully performed, and that there was delay in the completion of the same, whereby damage accrued to them in the sum of $2,200. No testimony was taken by claimant tending to maintain its defense, either as to the alleged unskillful manner in which the work was performed, or that there was any delay in its execution, and the case turned in the lower court solely upon the right of the libelant, under the circumstances, to recover for the extra work done. The written contract contained a clause that no new work of any kind done on the steamer, and no work of any kind, should be considered as extra work unless a separate estimate in writing should be made for the same before its commencement, and submitted by the contractor to the respondent company, and the signature of the chairman of the board of directors obtained thereto.

The learned judge in the court below, while recognizing that this clause might be waived by the parties, and that they, either by their acquiescence in what was being done, or ratification of what had been done, might make themselves liable for extra work, was, nevertheless, of opinion that there was not sufficient evidence in the record to sustain the contention that the respondent company had ever formally abrogated the written contract, or, in view of the said clause as to extra work, had ever authorized the libelant to do the work as charged for by him, or acquiesced in or ratified what he did so as to become liable therefor. With these conclusions we do not agree, and think, under the circumstances, the libelant is entitled to recover for the amount of the extra work performed by him. The decision of the trial court upon questions of fact, where the judge saw and heard the witnesses testify, might have great and controlling weight; but here, where the evidence was taken by an examiner, this court will more readily examine the same, and reach its own conclusions thereon. The Glendale, 26 C. C. A. 500, 81 Fed. 633, 635; Duncan v. Nicholls, 44 Fed. 302; The Ludvig Holberg, 43 Fed. 120; The Thomas Melville, 37 Fed. 271. But we do not regard this as a case depending upon conflicting evidence, or the credibility of witnesses, but rather upon the legal effect of what it is admitted was said and done by those acting for the respondent corporation under circumstances not disputed. That there was a necessity for the extra work is apparent from the whole evidence, and without the extra work it would have been entirely impracticable to have carried out the written contract at all. The claimant's witness Cherry, the master of the steamer, and superintendent placed in charge of the repairs, thus described the condition of the steamer after she was stripped:

"I did not think she was in very bad shape after we got her on the railway until we ripped the lining off, and it was all gone underneath. The timbers would look good on top, but were all gone underneath, like the shell of an egg."

He also stated, in answer to the question of whether he had not stated to Mr. Bird, the secretary of the company, that they would have to make a new hull:

"Yes, I told him in these words: That I thought it cheaper to pay Mr. Pregnall to cancel the obligation, and build a new hull. I thought it would be cheaper in the end."

The United States inspector of hulls, W. H. Cannon, testified as follows:

"Question. What did she show after she was stripped? Answer. Very bad. Timbers completely gone, except eight or ten under the engine. It was necessary for them all to come out except ten or twelve. Question. Did you see any decayed knees? Answer. Some I did not count. More were there, but, when I found that Capt. Cherry had a disposition to repair the boat, I did not interfere with him."

Witnesses Seth Ferrara and John F. Cummen, both shipwrights, and who worked upon the steamer while the repairs were being made, say that the main keelson, fore and aft, and various portions of the hull, were in a rotten and charred condition; that it was dry rot from the heat and dampness, and would not hold anything, and that it was

knocked out with a mall; and that the steamer in her condition was utterly unseaworthy. The libelant S. J. Pregnall testified that he found her cross-beams nearly all rotten, the knees nearly all rotten, the keelson all rotten, the keelson under the boiler rotten, her plank sheers rotten, apron and deadwood rotten, stern posts defective, and, in short, that there was nine-tenths of her that had to be rebuilt, and that it was impossible for him to do the work covered by the agreement without renewing these rotten parts; that he could not fasten sound material to a rotten structure, and that there was nothing upon which to build. It is the controversy as to what occurred between the parties upon the discovery of this condition of the steamer, and was thereafter done, which gave rise to this litigation. Libelant's statement is that after he and Capt. Cherry, the master of the steamer, and superintendent of the work, consulted, they went down to see Mr. Witte, the president of the company, and told him that the steamer would have to be rebuilt; and, in answer to the question, "Did you describe the condition of affairs?" the libelant says:

"I did, and so did Captain Cherry. After consulting a time, he wanted to know if I could do the work in time to save the season. He then considered the costs of a new boat against rebuilding that one. I suggested that by taking out the machinery I could save four thousand or five thousand dollars. I did offer to build a new boat hull for $11,000.00. They decided then that I should go on make the old hull new. Mr. Witte told me, 'All right, go ahead.' I told him that I did not have means to do that much work. He said he would furnish me with means every week to pay men, which he did, and I went along with the work, and completed it."

Capt. Cherry's statement is, in substance, that he informed President Witte of the wretched condition of the steamer, his surprise as to its condition, and that the latter said: "I am sorry that we did not know it sooner. We will try to do the best we can." That he went and told Mr. Pregnall that the vessel would have to be ripped up, and rebuilt, or, rather, retimbered. In answer to the question of whether he understood, at the time he accompanied libelant to see President Witte, the latter authorized libelant to do any work he pleased outside of the contract, he replied, "No," and in reply to the specific question, "Did President Witte authorize Mr. Pregnall to do any work outside of the contract?" replied, "Not as I know."

President Witte's account is as follows:

"I remember it distinctly. Captain Cherry and Mr. Pregnall came down to the office, as they said that the vessel was not in as bad condition as represented by some people, making mention of some certain parties at the time, and that she could be repaired, and be a stronger and stouter vessel than before, with some other expression, stating that putting these keelsons on, and which were in the contract, the vessel would be stouter and better than ever before. The question of about how much it would cost to build a new hull came up in this way: As some people said it would be cheaper to build a new than repair the old, this was reported to me that such had been said, and I asked Mr. Pregnall how much he could build a new hull for. He said $11,000.00. I said, 'Well, I was told it could be done for $8,000 or $9,000.' He said his price was $11,000.00. Q. Did you, in consequence of that conversation, say, 'All right; go ahead'? A. No; I told them after that that we concluded to go on with the contract. That was the result of the conversation, —and finish the vessel. * * * Q. When Captain Cherry reported to you on the first day that the vessel was worse than he thought, and that her condition was rotten, was it your desire to replace with sound all the rotten wood?

A. Certainly; that was the object in repairing the vessel. Q. Did you express to Captain Cherry that desire and intention when he spoke to you of the rotten condition of the vessel? A. No. The understanding was that Captain Cherry should be present for the purpose of seeing what wood was rotten taken out, and no wood put back except such as was sound. Q. After this rotten condition of affairs was reported by Captain Cherry, was it your wish and intention, with the work that went on after that, that all the rotten wood should come out, and be replaced by sound wood? A. Certainly. * * * Q. What was the object of the work being done on the vessel? A. Repairing her. Q. What for? A. Making her seaworthy. Q. To run her as a passenger boat in June and July? A. Yes. Q. Were you not hurrying to get the boat for the 1st of June? A. It was desired to have the vessel ready by the specified time. Q. You intended to run the boat the 1st of June as a passenger boat, without taking all the rotten wood out, and replacing it by sound wood? A. Of course not. * * * Q. And further, in July, didn't you run the boat? A. I suppose that was the time. * * * Q. Did you care? A. As a matter of course I cared. If I had known there was rotten wood in there, I would have taken it out. * * * Q. Did you see any knees that were rotten? A. Oh, yes; I saw some ribs,—knees, I suppose they were. I don't know what you call a rib or what you call a knee. Q. Did you see any of the deck that was rotten? A. Yes, I saw a portion of it. Q. What did you say about those knees? A. Nothing in the world. What should I have said? * * * Q. What did you expect Mr. Pregnall to do in the event of his having extra work outside of the written contract? A. I expected him to take the chances whether we would pay him or not. Q. If he did it? A. Yes, of course. If he did any, he did it at his own risk. He certainly didn't do it with my consent."

It will be observed that this statement of President Witte is not a denial of what the libelant Pregnall stated. The question under consideration was between building a new hull or repairing an old one, and they both agree that the offer of $11,000 for the new hull was rejected, and Mr. Witte admits that he said, "Go on with the contract," which must have referred to repairing the old hull under its newly-discovered condition, and not to carrying out of the original contract of the 25th of February, 1897, to repair the steamer when the utter unseaworthiness of the hull was not known of. The execution of the written contract without change or modification on the part of libelant would have been impossible, and, so far as respondent is concerned, would have been to have done a vain and foolish thing, namely, to have expended nearly $7,000 in repairing a ship without a hull. Libelant swears that the agreement was to repair the old hull, and that was what he proceeded to do, and President Witte's action in appointing Capt. Cherry to superintend the taking out of the rotten wood and supplying it with sound instead sustains this idea.

W. M. Bird, one of the directors and secretary of the respondent company, and the libelant in the second of these causes, testifies that Capt. Cherry talked with him about building a new hull to the boat, and explained that he had talked with Mr. Witte, and that the latter had told him to go ahead, and do what work was necessary,—to repair the boat, and put her in thorough order. This was done after the foregoing interview between libelant Pregnall and President Witte. Work was immediately begun on the hull, under the direction of Capt. Cherry as superintendent, who stayed at the work, and directed personally what rotten wood and timbers should be taken out and what work should be done, and how it should be done, until the steamer was completed; and, in the language of the United States inspector of hulls: "She was in first-class order. I never saw a boat

in better. * * * I think she was better than when she was brought here in 1876. I think she had better timbers in her." While this work was being done, President Witte was frequently at the steamer, and saw for himself what was being done; the evidence being that he would drive down about once a week. His own superintendent, specially designated by him for the purpose of looking after the work, was there all the time. The secretary of the company and its superintendent, Mr. Armine Witte, were frequently there, as were also Messrs. Lapan and Thompson, two directors of the company. In all, six officers of the company, several of whom had full knowledge of all that was being done, and all of them abundant opportunity to see what was done, and they one and all stood by and allowed the work charged for to be done and services performed, and the respondent company acquiesced therein by weekly supplying, according to the contract, sums necessary to pay off the employés for the labor performed. Under these circumstances, the work, in our opinion, should be paid for, and it will not do for President Witte to say that the contractor "did the work at his own risk," and that "I expected him to take the chance of whether we would pay him or not." Under such circumstances the law implies a contract, and a promise to pay. It is not in dispute that the services were properly and seasonably rendered, and it is equally clear that the work was necessary; and to allow, under the circumstances, the respondent company to have the benefit of libelant's money and labor without compensation, would be grossly unjust and inequitable. When the president of the company, upon being told that the contract could not be performed, so as to make the steamer seaworthy, without replacing the rotten material discovered in her hull, directed Pregnall to go on with the contract, and had his superintendent overlook and direct the replacing of the rotten knees and timbers, Pregnall, from his words and conduct, had a right to understand that the president consented to his doing the necessary extra work, no matter what the president may have had in his mind, undisclosed to Pregnall, with regard to the effect of the contract.

In what we have said we have not been unmindful of the clause in the written contract as to the conditions on which extra work could be done. This clause is carefully worded, and is sweeping in its terms, but, nevertheless, in our opinion, can be and was waived by what took place between the parties. Authorities to show that such clauses can be waived by the subsequent acts and conduct of the parties are abundant. Wood v. City of Ft. Wayne, 119 U. S. 320, 321, 7 Sup. Ct. 219; West v. Platt, 127 Mass. 367, 372; O'Donnell v. Clinton, 145 Mass. 461, 463, 14 N. E. 747; Bartlett v. Stanchfield, 148 Mass. 394, 19 N. E. 549; Cunningham v. Fourth Baptist Church, 159 Pa. St. 620, 28 Atl. 490; Bowe v. U. S., 42 Fed. 777.

The contention made, or, rather, suggested, that the liability should be escaped because the respondent is a corporation, and did not formally, by its board of directors, agree to the making of a new contract, or authorize, assent to, or acquiesce in the performance of the additional work in question, is equally without merit. Corporations only act by and through agents, and in Pittsburgh, C. & St. L.

Ry. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371–381, 9 Sup. Ct. 773, it is said:

"When a contract is made by any agent of a corporation in its behalf, and for a purpose authorized by its charter, and the corporation receives the benefit of the contract without objection, it may be presumed to have authorized or ratified the contract of its agent. Bank v. Patterson's Adm'r, 7 Cranch, 299; Bank v. Dandridge, 12 Wheat. 64; Zabriske v. Railroad Co., 23 How. 381; Gold-Min. Co. v. National Bank, 96 U. S. 640; Gas Co. v. Berry, 113 U. S. 322, 327, 5 Sup. Ct. 525. This doctrine was strongly stated by Mr. Justice Story, delivering the judgment of this court in each of the first two of the cases just cited."

The supreme court has passed upon this question in many instances. In Railroad Co. v. Howard, 7 Wall. 413, it is said:

"Corporations, as much as individuals, are bound to good faith and fair dealing, and the rule is well settled that they cannot, by their acts, representations, or silence, involve others in onerous engagements, and then turn round and disavow their acts, and defeat the just expectations which their own conduct has superinduced."

The second case involves the question of whether libelants William M. Bird & Co. have a lien under the statute of South Carolina, enforceable by libel in rem in a court of admiralty against the steamer for materials furnished the general contractor, Pregnall, in making the repairs aforesaid to the steamer. The learned judge of the court below was of opinion that such lien existed, and was enforceable in a court of admiralty by libel in rem against a domestic vessel for materials and supplies, maritime in their nature, such as were furnished in this case (The Planter, 7 Pet. 343; The Lottawanna, 21 Wall. 568; The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498; The Kate, 164 U. S. 470, 17 Sup. Ct. 135; The Glide, 167 U. S. 610, 17 Sup. Ct. 930), but held that it was necessary to prove that the debt was contracted upon the credit of the steamer, and not of the owner or contractor making repairs; and, believing that the libelants' claim was not one incurred on the faith of the ship, dismissed the libel. With our view of the evidence, we deem it unnecessary to do more than pass upon the question of fact involved in this decision. Our conclusion upon the whole evidence is that the materials were furnished upon the credit of the steamer, and not to the contractor individually. The libelants so testify. Many of the articles were ordered by the master of the steamer, placed in charge of the work thereon by the respondent company, and the others by the respondent's general contractor, who was himself without credit; and there is no claim but that the supplies were furnished to, and used in the repair of, the steamer, and that they have not been paid for, either to the libelants, who furnished them, or to the general contractor, who used them in rebuilding respondent company's vessel. 1 Rev. St. S. C. § 2504, is very comprehensive in its terms, and a lien is expressly given to any person for labor performed, materials used, or labor and materials furnished in the construction, launching, repairs of, or for provisions, stores, or other articles furnished for or on account of a ship or vessel by virtue of a contract, expressed or implied, with the owners of a ship or vessel, or with the agents, contractors, or subcontractors of such owners, or any of them, or with any person having been employed to construct, repair, or launch such ship, or to assist them.

We think the libelants William M. Bird & Co. have a lien upon the steamer for the supplies so furnished and used in its construction.

For these reasons, the decrees appealed from are reversed, and the causes remanded to the lower court, with instructions to enter a decree therein in favor of the libelants in the second-named libel for the sum of $868, with interest at the rate of 6 per cent. per annum from the 22d day of May, 1897, until paid, with costs, and a like decree in favor of the libelant Samuel J. Pregnall for $1,184.37, with interest from May 22, 1897, until paid, with costs. Reversed.