## AMERICAN ASIATIC CO. v. ROBERT DOLLAR CO. *

(Circuit Court of Appeals, Ninth Circuit. September 5, 1922.)

### No. 3853.

1. **Appeal and error ⬤➡1008(1)—When testimony not taken in presence of judge, appellate court reaches its own conclusions thereon.**

   Where the testimony was taken by a commissioner, and not in the presence of the District Judge, the Circuit Court of Appeals examines it, and reaches its own conclusions.

2. **Shipping ⬤➡58(2)—Entry in log held insufficient to show delay was due to complete breakdown of engine, within charter.**

   Under a charter party providing for cessation of hire for loss of time from breakdown, and for allowance in case of loss of time not amounting to complete breakdown, .entry in ship's log, showing that the engine was stopped about 12 hours to repair the pumps, *held* insufficient to show that there was a complete breakdown.

3. **Shipping ⬤➡58(2)—Presumed that defect in engine of chartered vessel existed when voyage commenced.**

   Where a defect in the engine of a chartered vessel, which the owner warranted tight, staunch, strong, and fit, and warranted to maintain in a thoroughly efficient state, developed only six days after the vessel commenced a voyage, during which time she had encountered no bad weather, peril of the sea, or unavoidable accident, it is to be presumed that the defect existed when the voyage was commenced.

4. **Shipping ⬤➡38—Owner, by stopping discharge of cargo, held not to terminate charter, and charterer merely entitled to deduction.**

   Where the owner of a chartered vessel stopped the discharge of cargo for about 48 hours because of nonpayment of the charter hire, but after adjustment the charterer again took charge and completed the discharge, the owner's act was not a cancellation of the charter or withdrawal of the vessel from the service, terminating the charter hire, but merely entitled the charterer to a deduction for the period during which the discharge was stopped.

5. **Shipping ⬤➡51—Failure of charterer to give written directions held not to justify master in sailing without cargo.**

   Where a charter entitling the charterer to the full capacity and burthen of the vessel required the vessel to proceed to A. and load rails, and was supplemented by oral instructions to the master to the same effect, it was his duty to follow such instructions until countermanded or modified, and the fact that he was given no written directions did not justify him in leaving A. without cargo, because of a delay in loading.

6. **Shipping ⬤➡51—Breach of charter for master to leave loading point without cargo and without charterer's consent, because of delay in loading.**

   Where a time charter, whereby the charterer hired and paid for the full capacity and burthen of the vessel, contained no covenant to load the cargo within any stated time, or at all, it was a breach of the charter for the master to sail from the designated loading point without instructions or the charterer's consent, because of delay in loading, unless such delay amounted to a repudiation or formal refusal to perform, or a commercial failure of the adventure.

7. **Shipping ⬤➡62—Master the agent of the owner, and not of the charterer.**

   The master of a chartered vessel was the agent and representative of the owner, and had no authority to represent or act for the charterer, and the owner was liable for his act in leaving the designated loading port without cargo, because of delay in loading.

---

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied October 30, 1922.

**8. Shipping ⬦⟫52—Delay in loading held not repudiation of charter or failure or adventure, justifying master in sailing without cargo.**

Delay in loading a cargo on a chartered vessel at Acapulco, Mexico, due to delay in securing permission from the local authorities, because of the unsettled conditions in Mexico, the difficulties of communication, and the method of transacting business and loading cargo at Acapulco, *held* not a repudiation of the charter or failure of the adventure, justifying the act of the master in sailing without the cargo.

**9. Principal and agent ⬦⟫100(6)—Agent of cargo owner and its vendor not authorized to give shipping instructions on behalf of charterer.**

One who was the agent of the owner of cargo intended to be loaded on a chartered vessel and of the company from which the cargo was purchased was not the agent or representative of the charterer, and had no authority to give shipping instructions on its behalf, or bind it by consenting or agreeing that the vessel might leave without the cargo, because of delay in loading.

Appeals from the District Court of the United States for the First Division of the Northern District of California; Frank H. Rudkin, Judge.

Consolidated suits by the American Asiatic Company against the Robert Dollar Company and by the Robert Dollar Company against the American Asiatic Company. From adverse decrees, the American Asiatic Company appeals. Reversed and remanded.

Fitzgerald, Abbott & Beardsley, of Oakland, Cal., Manson & Allan, and Bell, Simmons & Creech, all of San Francisco, Cal. (Golden W. Bell, of San Francisco, Cal., of counsel), for appellant.

Ira S. Lillick, of San Francisco, Cal. (Hunt C. Hill, of San Francisco, Cal., of counsel), for appellee.

Before MORROW and HUNT, Circuit Judges, and BEAN, District Judge.

BEAN, District Judge. These appeals are from decrees of the District Court in the cases of the American Asiatic Steamship Company against the Robert Dollar Company to recover damages for a breach of a charter party for the steamer Kaijo Maru and by the Robert Dollar Company against the steamship company to recover unpaid charter hire for such vessel.

On June 13, 1917, the Robert Dollar Company (hereafter referred to as the "owner") entered into a time charter at San Francisco with the American Asiatic Company (hereafter designated as the "charterer"), whereby the former let to the latter and the latter hired from the former the whole reach, capacity, and burthen of the steamer Kaijo Maru, for one trans-Pacific voyage, "to be employed in such lawful trade as the charterer might desire, namely, steamer to proceed hence in ballast to Acapulco or adjacent waters to load rails," returning to San Francisco to finish loading for Japan. The charter hire was at the rate of $13.50 per ton dead weight tonnage of 5,200 tons, or $70,200 a month, payable in advance and was to continue at the same rate for any time thereafter until the vessel should be redelivered to the owner at Kobe. The owner was to employ and pay the officers and crew, and provide and pay for all provisions, and at all times to maintain the vessel in a thoroughly

---

⬦⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

efficient state in hull and machinery. The cargo was to be loaded or discharged at any wharf or place that the charterer or its agent might direct, where the ship could lie safely afloat. The captain, although appointed by the owner, was to be under the orders and direction of the charterer as regards employment, agency, or other arrangements, and it was to furnish from time to time all requisite instructions and sailing directions, "charterer to issue written instructions and supply their form of logs to be kept."

It was further provided that, in the event of loss of time from breakdown of machinery, preventing the working of the vessel for more than 24 hours, the payment of hire should cease (including the first 24 hours) until the vessel is again in an efficient state to resume her service; but in the event of loss of time, not amounting to a complete breakdown, but delaying the steamer, the charterer is to be entitled to an allowance from the hire sufficient to cover such loss of time and the value of extra coal consumed.

The performance of the terms of the charter party was guaranteed by the Central National Bank of Oakland and by Weisenbaum & Co. The vessel was delivered to the charterer on June 21, and $70,200, the charter hire to and including July 20, paid. The captain was advised of the charter, and instructed by the charterer to sail for Acapulco, which he did on June 23, and arrived Saturday evening, June 30, at 11 o'clock p. m. The vessel remained at Acapulco until July 6, at 6:15 p. m., when she sailed for San Francisco in ballast, without taking on cargo, arriving in San Francisco on Saturday, July 14. She had no wireless, and it was impossible to communicate with her en route.

Upon arrival at San Francisco the captain was requested to return to Acapulco, but refused to do so without permission from Japan, and the vessel was subsequently loaded at San Francisco for Japan, after notice to the owner by the charterer that in so doing it did not waive any rights which had accrued to it by reason of the steamer's departure from Acapulco. On July 23 the charterer paid, under protest, $70,200, the charter hire for the second month. Thereafter, and on July 24, the charterer was advised that the ship was ready to return to Acapulco, but under protest, and without admitting responsibility for her having left that point. By that time, however, there had been loaded on her a large amount of cargo for Japan, and it was thought that the loss or damage would be mitigated by having the steamer proceed to Japan, instead of discharging the cargo and returning to Acapulco. The vessel completed loading at San Francisco on July 31, and on August 1 sailed for Kobe, Japan, arriving there on the 25th, and completed discharging cargo on September 10.

During the voyage from San Francisco to Japan the vessel was delayed about 12 hours for the purpose of repairing the main pump, and after she had arrived at Kobe and before she had completed discharging cargo, the owner stopped the discharge for about 48 hours, when the charterer again took charge and completed the discharge for the cargo, and the vessel was redelivered to the owner on September 10 at 9 o'clock in the morning. Thereafter these suits were commenced, that by the owner to recover charter hire from August 21, 1917, less

the value of coal left in the bunkers at the time the vessel was re-delivered, and that by the charterer to recover damages for the wrongful departure of the vessel from Acapulco without taking on cargo. The charterer also claims a deduction from the charter hire for loss of time while the main pump was being repaired on the voyage to Kobe, and that the hire ceased when the owner stopped the discharge of cargo at Kobe.

The causes were consolidated for trial and were referred to a commissioner, who took and reported the testimony, and the court below, after considering the same, entered a decree dismissing the charterer's libel, and one in favor of the owner for the unpaid charter hire, without any deduction for delay while repairing the pump, but allowing a deduction for the time the discharge of cargo was stopped by the owner at Kobe. From these decrees the charterer has appealed.

[1] As the testimony of the witnesses in these cases was not taken in the presence of the District Judge, we are to examine it and reach our own conclusions. The Frey, 106 Fed. 321, 45 C. C. A. 309; The Glendale, 81 Fed. 633, 26 C. C. A. 500. Before considering the main controverted question in the case—and that is whether it was a breach of the charter party for the vessel to leave Acapulco in ballast without taking on cargo—we will first dispose of the other issues. The charter hire was paid to August 21. The owner claims that it should receive hire from that date at the stipulated rate until the redelivery of the vessel to it on September 10, while the position of the charterer is that the hire ceased when the owner stopped the discharge of cargo on September 1, and that it is entitled, in addition, to a deduction on account of the delay en route to repair the main pump.

[2, 3] Unless the delay was due to a complete breakdown within the meaning of clause X of the charter, the charterer is entitled to a deduction for the delay and the value of the coal consumed during that time. The only evidence upon this question is a brief entry in the ship's log as follows:

"6/8/17, 4:30 p. m. Stopped engine to repair main pumps. 7/8/17, 5:22 a. m. Repair finished. Proceeding full speed."

This, in our opinion, is not sufficient to show a complete breakdown. The owner was in a position, through the master and crew, to prove, if it is a fact, that the delay was due to such cause; but it offered no evidence on that subject. Moreover, by the terms of the charter party the owner warranted that the vessel shall be tight, staunch, strong, and in every way fit for the service, and that it "shall at all times maintain her in a thoroughly efficient state in hull and machinery for the service." The defect developed only six days after the vessel commenced her voyage from San Francisco, and during that time she had encountered no bad weather, and no peril of the sea or unavoidable accident is shown. It is therefore, we think, to be presumed that the defect existed when the voyage was commenced. Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012. The charterer is entitled to a deduction for the delay.

[4] After the arrival of the vessel at Kobe the owner stopped the discharge of cargo from 8:45 in the morning of September 1 to 7 o'clock in the morning of the 3d, because the charter hire due August

21 had not been paid. The charterer claims that the owner thereby completely withdrew the vessel from its service, and that the charter hire ceased at the time of such withdrawal, notwithstanding it (the charterer) at the expiration of such period again took charge of the vessel and completed the discharge of cargo. The court below ruled that the owner was entitled to charter hire at the time of the redelivery of the vessel on September 10, less a deduction for the period during which the discharge of cargo was stopped by the owner, and in this view we concur. The charter was not canceled, nor was the vessel withdrawn from the charterer's service, but merely a temporary stoppage of her discharging, which seems to have been adjusted, and the charterer again took possession and completed the discharge.

We now come to the principal question in the case. The rails which were to be loaded on the vessel at Acapulco formerly belonged to the Mexican Pacific Railway Company and had been sold by it to Weisenbaum & Co. of San Francisco, and were to be exported under a permit issued by the Mexican government to one Pardres. In order to facilitate their shipment, one Fred Nash was employed by the railway company to go to Acapulco to act as its agent to "check the rails lying at Marques Bay, also all other material that there may be at the above port," and as the agent of Weisenbaum & Co. to "take charge of the hiring of all men that may be necessary for the handling of all material, to hire barges, lighters, and tugboats, and whatever may be necessary for quick execution of loading," and to make payment therefor.

Nash and a stevedore went on the ship to Acapulco; but, as it was not allowed to carry passengers, two of the regular crew were left ashore in San Francisco, and they were listed as members of the crew, although not so in fact. After the arrival of the vessel at Acapulco, the captain appointed one Hudson, a local resident, as consignee or ship's agent. On the day after the arrival, the captain, Nash, and Hudson went in a launch to Port Marques, a small bay near the entrance of the harbor of Acapulco, and about five miles from the town where the rails were to be loaded, to examine the location of the proposed cargo and ascertain the best place to moor the vessel.

The rails were in piles 200 or 300 yards from the beach, where they had been transported some years before on push cars operating on a railway track from the beach. At the time of the visit of Nash, Hudson, and the captain, the railway track was in place and the wheels and iron work of the push cars intact. The track, however, was overgrown with brush, and many of the ties and the woodwork of the cars decayed. There was no wharf or pier at which the vessel could lie to take on cargo. To load the rails it would have been necessary to transport them over the railway track on push cars to the beach, and then have them carried by men and loaded on lighters, and thus transported to the vessel anchored about 100 feet from the shore—a practical method, as evidenced by the fact that they were subsequently so handled.

On the next day the captain, Nash, and Hudson called upon the collector of the port for permission to export the rails. They deposited with the collector Hudson's appointment as agent of the ship, and were shown by him authority from the Mexican government for the exporta-

tion by one Pardres of 10,000 tons of old rails and old junk "which operation shall be made by Weisenbaum or such other person as he may designate." The collector at the time raised some question (which was cleared up before the ship sailed) as to Nash's authority to represent Weisenbaum, because he did not have a formal power of attorney; but he gave permission to start the work of repairing the track and cars and getting ready to load the rails. On the same day or a day later Nash filed formal written application with the Governor for authority to export the rails, and was told by that officer that he would have to refer the matter to Mexico City for action, and was subsequently advised by him that the matter had been so referred by wire, and that an answer would be made known as soon as received. On the 3d a carpenter and crew of men were sent to Port Marques to repair the track and cars, so that the rails could be moved to the beach, and this work was completed before the vessel sailed on the 6th.

There was communication by wireless from Acapulco to Mexico City, the United States, and other points. On July 1 the captain wired parties in Japan and Manila advising them of his arrival. On the 4th he wired the owner at San Francisco, saying, "Authorities holding cargo." Each of these messages was returned from the border by the censor because the captain did not sign his full name. They were properly signed and again forwarded on July 5. The one addressed to the owner was received by it at San Francisco July 6, 53 minutes before the vessel sailed. Copies thereof were delivered to the charterer and Weisenbaum on the next day, and the latter immediately wired Hudson, if the vessel had not left the port, to advise Nash and the captain to remain until instructed to sail. On July 5 Nash, with the knowledge of the captain, wired Weisenbaum & Co., at San Francisco:

"Am completing arrangement with government. Expect to start loading day after to-morrow."

On the morning of the 6th, or some time during the day, the collector of the port for the first time raised the question as to whether the permit under which it was proposed to export the cargo covered new rails, and advised the parties that he would have to submit that matter to the authorities at Mexico City for their determination. When the captain was informed of that fact, and that no reply had been received to the message from the Governor to the Mexican government, he said he could not wait longer, and requested Hudson to obtain clearance for the ship, which was done, and it sailed about 6 o'clock in ballast. A few days later the matter affecting the loading of the rails was cleared up, and permission was given by the Mexican authorities to export them.

The charterer claims that, inasmuch as it had the capacity and burthen of the vessel under a time charter, with no stipulation as to the length of the voyage or the time for redelivery at Kobe, and had paid the charter hire to July 21 in advance, and obligated itself to continue to pay such hire until delivery of the ship at Kobe, the departure from Acapulco in ballast without its consent was wrongful, and for which it is entitled to damages. The owner insists that the charterer cannot complain of the master's action in leaving Acapulco, because it failed to give him written sailing directions and instructions, and that in any

event the master was intrusted with discretion to act for all interested parties, including the charterer, and that he did not abuse such discretion.

[5] There is no room for controversy on the record as to sailing directions. The charter stipulates that the vessel shall proceed to Acapulco and load rails, and this was supplemented by oral instructions to the master to do so, upon which he acted. These were the only instructions which he received, and which he should have followed until such time thereafter as they were countermanded or modified by the charterer, or until the contract was at an end by misfortune or the act of the charterer. The fact that the charterer did not give written directions as to the length of time the ship should remain at Acapulco would in no sense justify him in leaving without cargo, and thus completely destroying the purpose of the adventure. There is, in truth, no causal connection between the fact that the master did not receive written instructions at San Francisco and his departure in ballast from Acapulco. If the instructions which were given him, and upon which he acted, had been in writing, the situation would be exactly what it is now.

[6-8] In our opinion, it was a clear breach of the charter for the master to sail from Acapulco without being instructed so to do by the charterer and without its consent. The length of time the vessel was to remain awaiting cargo was a matter for its determination. The loss, if any, from the delay, would fall upon it, and not the owner. The owner had received hire up to the 21st of July, and security for all subsequent payments, and it was no concern of either the owner or the master whether cargo was loaded or not. There is in the charter party no covenant on the part of the charterer that it will load cargo within any stated time, or, indeed, at all. It had hired and paid for the full capacity and burthen of the vessel, and was entitled to use it or not, as it pleased. It could employ it as much or as little as it chose. Trechmann S. S. Co., Ltd., v. Munson S. S. Line, 203 Fed. 692, 121 C. C. A. 650. Nor did the master have authority to represent or act for the charterer. He was the agent and representative of the owner, and for his acts the owner is liable. The Santona (C. C.) 152 Fed. 516; The Maud H. Dudley (D. C.) 205 Fed. 974. To justify or excuse his departure without cargo, it must appear that there was either such a failure to load as would amount to a repudiation or formal refusal to perform or a commercial failure of the adventure. Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; The Harriman, 76 U. S. (9 Wall.) 161, 19 L. Ed. 629; The Julia Blake, 107 U. S. 418, 2 Sup. Ct. 692, 27 L. Ed. 595.

Neither of these facts here appear. The charter was not repudiated, and there was no failure of the adventure. On the contrary, the charterer had paid the charter hire and was entitled to the benefit thereof. It should have been given an opportunity to say whether the ship should remain longer at the loading port. Neither the owner nor master had the right to substitute their judgment or discretion for the instructions of the charterer. The cargo owner was making every effort to secure authority from the local authorities for its loading and exportation, with every reasonable prospect of success, and expected to begin loading at an early date. The unsettled conditions in Mexico, the difficulties

of communication, and the method of transacting business and loading cargo at Acapulco were known to the owner and captain at the time the charter party was made, and they each anticipated delay at that port. But without waiting to ascertain whether arrangements could be completed for loading or until advice could be received from the charterer—indeed, without attempting to communicate with it and receive instructions from it as he should have done (The Ponce, 178 Fed. 76, 103 C. C. A. 346; Astrup v. Lewy et al. [D. C.] 19 Fed. 536)—the master sailed in ballast, thus frustrating and completely destroying the adventure.

[9] Some contention is made that Nash consented to the departure of the vessel. The evidence on that subject is conflicting, but we do not regard it as material. It is not claimed that Nash gave any written instructions to return to San Francisco. Moreover, he was not the agent or representative of the charterer, but of the railway company and Weisenbaum & Co., the cargo owner. He had no authority to give sailing instructions on behalf of the charterer, or bind it by consenting or agreeing to an act which completely destroyed the purpose it had in view. His business was to attend to loading the cargo.

It follows that the decrees of the court below will be reversed, and the causes remanded to that court for such further proceeding as may be proper, not inconsistent with this opinion.